Good morning all. Our third panel member, Judge Mannion, is with us on the phone. He's unable to be here today in person, but you have a complete panel of three judges. Can you hear me okay? Yes, can you hear us, Dan? I can. Okay. I'll try to keep my voice raised, and I really appreciate this. I got home from the hospital at 930 last night, but I'm doing fine, and I really appreciate your accommodation here, and to the litigants as well. I hope no one's suffering from the big wind. Well, it's a little breezy here in Chicago. How is it in South Bend? It's about the same, I guess, just looking at the weather reports. We get a 50 mile an hour gust, but no trees down in my driveway. That's the main thing. Okay. Well, we'll start today's cases with Citadel Securities v. Chicago Board of Options Exchange. Mr. Bedell. Good morning, Your Honor. To please the court, my name is Stephen Bedell, a Fulham Lardner, and I represent the plaintiff appellants. The district court decision below dismissing this case for failure to exhaust administrative remedies should be reversed for two fundamental reasons. First, exhaustion of remedies is neither necessary nor appropriate where the action involved was for-profit private business activity, and second, there is no administrative remedy here to exhaust because the SEC's rules of practice preclude review of this matter, and the SEC is not authorized by the district court's decision is directly at odds with the second, ninth, and eleventh circuits, all of which uniformly held that the test of whether an exchange's activity is regulatory in nature and thereby deserving of the protection of the exhaustion and immunity doctrines turns upon whether the exchanges in so acting, quote, stand in the shoes of the SEC performing functions that the SEC itself would otherwise be performing. Here, the district court erred by relying on the fact that these programs, these payment forward or fall programs, were implemented pursuant to the SEC's rulemaking process, but what the court ignored was the fact that in the rulemaking submissions, these exchanges and in concomitant releases of the SEC all acknowledged that these programs were competitive responses to an ever more ferociously competitive marketplace, and the programs were designed and had the function of luring order flow from other exchanges to the exchange in question and thereby drive additional profits, volume, revenues. By definition, this conduct is business activity and indeed, in connection with these rulemaking proposals and in its own 2004 concept release, the exchanges and the SEC all acknowledged that these programs posed potential conflicts with the exchanges' regulatory obligations. Various exchanges commented that their fear was that these programs, by incenting the order flow to an exchange by the payment of rebates, would undermine price competition. They made the point that the market makers on incentives to drive order flow to that exchange by aggressive quotations, aggressive price competition, and best execution, and that by skewing the incentives and drawing order flow to that exchange by the payment of rebates, there was at least the threat that these important functions would be undermined. And so in these rulemaking proposals, the exchanges went to some lengths to explain that even though these programs were designed to drive properly and surveilled properly, they could be rendered consistent with the exchanges' duties under the Exchange Act. The district court did not mention any of these concerns at all and simply relied upon the fact that these were submitted as rulemaking proposals and have been labeled by the exchanges as rules. But the district court failed to note that in two recent cases, Facebook case out of the Southern District of New York and Opulent funds out of the those cases involved programs or activities that had been submitted to the SEC pursuant to rulemaking and approved by the SEC. And the same argument being made here was made in those cases and was emphatically rejected by those courts who ruled that it is the substance and not the form that governs the determination of whether the activity is regulatory and entitled to the special protections that are normally only accorded to state actors or self-regulatory agencies acting in their stead. In those cases, the court said that the rule rulemaking per se is irrelevant to the decision as to whether the exchanges were entitled to protection accorded to state actors. Rather, the question is whether the exchanges in conducting these activities were acting in the shoes of the SEC and doing what the SEC itself would otherwise have done. Mr. Bedell, those cases are in the context of immunity, not exhaustion, right? Your Honor, Facebook was in the context of immunity but Opulent funds dealt with both immunity and exhaustion. And in those two cases along with Weissman really addressed the pivotal point which was that whether we're talking about immunity or exhaustion, the threshold consideration is whether the action involved is for-profit business activity or truly regulatory activity because the exchanges are only entitled to the protection of either doctrine if in fact their conduct is regulatory activity carried out in the regulatory capacity. And those exchanges, pardon me, those courts made that point that these special protections are only afforded to the exchanges where they are acting as regulators. In this case, the exchanges make an argument which essentially boils down to a request to this court to water down the rule that has been enunciated by the Second Circuit in NYC Specialists, the Ninth Circuit in Sparta Surgical, and the Eleventh Circuit on Bank and Weissman. The exchanges in this case, by the way, make the same argument that they made in those other cases which is that they should be deserving of the protection afforded to state actors if their business conduct is related to or incident to or somehow consistent with their regulatory obligations. These arguments were explicitly made and explicitly rejected by those courts who all noted that if in fact they went down that slippery slope, there was no limiting principle because virtually every activity on the part of the exchange would be somehow related to and hopefully consistent with its regulatory obligations. And by adopting the exchange's proposed formula, the end result would be that virtually any action taken by the exchange, even action driven solely to drive their profits, would end up getting the immunity and exhaustion protection that is only afforded to state actors or those acting in their shoes. Importantly here, another thing that the district court ignored was the fact that the SEC adopted its rules of practice pursuant to the requirements of the Administrative Procedures Act. And as the Supreme Court stated in Morton v. Ruiz, any agency that adopts administrative procedures must abide by them where individual rights are at risk. Under Rule 420, the exchanges laid out exactly what kind of exchange or SRO activities they would in fact review. And they are all typically actions where there's been an adjudication resulting in a denial of membership, fines or suspensions and the like. Nowhere in any of its rules does the SEC even remotely indicate that it is willing to consider reviewing an action for damages such as this. The probable reason for that is that under the Exchange Act, the SEC is not authorized to award damages. No court has ever ruled that the SEC has that power. Every court that has been asked to address that has acknowledged the fact that the SEC does not have that power and has never done so. The exchanges in response to that point argue that, well, the SEC could fine the exchanges or tell them to cease and desist, but that does nothing to make my clients whole for past actions. The exchanges also argue that the SEC could force the exchanges to disgorge. The problem with that is that that is an action provided for in the Exchange Act only for the SEC at its discretion, in its own good time, and it doesn't require the SEC to commence such an action to make a decision or to pay over the disgorged funds to the agreed parties. It doesn't preclude that, though. It doesn't preclude that, but the problem, Your Honor, is that under administrative review, administrative reviews presupposes some role for the agreed party who has some protections, some right, some opportunity to vindicate their rights, to present evidence. If there was, excuse me, Mr. Bedard, I didn't mean to interrupt. No, please do. If there was disgorgement, would that be an adequate remedy? Well, Your Honor, first of all, we don't even know what the type or level of disgorgement would be. Disgorgement by its nature normally means disgorging funds wrongfully withheld. The exchanges have made the point emphatically that they have passed those funds on and they no disgorgement may not even be available at all. If it is, we will never know, sitting here today, whether it could ever make us whole because we have no ability to understand or to know whether the exchange would pursue it, pardon me, whether the SEC would pursue it and what the amount of disgorgement would end up being. But the fundamental problem with that, Your Honor, is that underlying the whole concept of administrative review is that the agreed party actually has a right to seek review of it on its own with certain procedural protections. Well, if the SEC went first and the remedies were inadequate, relief still might be found in the district court, right? Well, Your Honor, not if the exchanges have their way here because the exchanges are asking this court to dismiss this matter with prejudice because we didn't exhaust our remedies. Well, perhaps there's a route other than dismissing with prejudice. Well, Your Honor, if the court wished to hold this matter in abeyance, to give the SEC an opportunity to pursue disgorgement with the condition that if the SEC failed to do so or failed to obtain disgorgement in the full amount or failed to pay over all of it to my clients with the understanding that my clients could then pursue their rights as needed or to recover whatever damages remain, that might be an equitable remedy. The problem here, Your Honor, is this time period in question already spans seven years. Well, I appreciate the temporal aspect. Right, right. And I don't know how many years it would take for the SEC action, if it ever occurred, to run its course. And in the meantime, justice delayed is justice denied. I'm familiar with the term. Yes, I know. What I think is important to stress here as well, because I think there's some confusion arising from the briefing here, it is important to emphasize marketplace, because the exchanges have argued that they are somehow serving to perfect the market by virtue of these programs. I note, first of all, that every court that has been confronted with that argument has made the point that perfecting or facilitating the market is not regulatory activity. We have cited those cases in our brief. So the threshold point is that doesn't constitute regulatory activity in the first place. But just so the court understands, the national market system was developed in the 70s and 80s because Congress perceived that there was a malaise in the market due to a lack of competition. In today's markets, the national markets, the electronically linked markets, have arrived. Actively traded options are multiply listed. All the exchanges are electronically linked, and competition is ferocious. These programs are not, I think, about growing the pie. In other words, if we think of all the open interest in the options market as a pie chart, and all the options trading in the national markets as part of that pie. I try not to think of those things. It makes me hungry. Go ahead. Well, this is not about growing the size of the pie. This is about each exchange fighting with the other exchanges to get a bigger piece of that pie. These exchanges lower order flow away from the other exchanges at the expense of those exchanges, and thereby grow their volume, their revenue, and their profits. So it's important to understand that is why exchanges, with the time that these programs were being instituted in the early 2000s, expressed severe reservations about these programs and concerns that they would undermine price competition and undermine the duty of best execution. And I will also add that in presenting these programs, only one of the exchanges here even mentioned the word liquidity. But it's important to understand that when we talk about liquidity, if we're talking about the overall depth of market in the national market system, that is not what these programs are designed to accomplish. They are competitive tools in a highly competitive marketplace. So I see that I'm almost out of time. Well, you can borrow your rebuttal time. I'll leave my rebuttal time, but thank you, Your Honor. Thank you, Mr. McGill. Mr. Henkin? Good morning, and may it please the Court. Douglas Henkin from Baker Botts, and although I only represent the NYSE entities and the ISE entities, I will be arguing on behalf of all of the defendants. I'd like to start, Your Honors, with two brief pickups from Mr. Bedell's presentation. The first one is a comment that he made, and he said, we don't know what would happen if the SEC were to get into this. And that's really one of the key points that I think the Court needs to keep in mind in addressing all of the various issues that have been presented to it. We do not know what the SEC would do because the plaintiffs never asked, and the plaintiffs never went to the SEC, and plaintiffs never gave the SEC the opportunity to do the SEC's job, specific job, under the 34 Act, which is to regulate and oversee the securities markets. And one of the very specific things that is committed to the SEC's jurisdiction in the first instance is to make sure that the SROs are following their own SEC-approved rules, which is precisely what this case is about. So I would actually expand on what Mr. Bedell said. We don't know two things. We don't know what the SEC would, how the SEC would react to an assertion that the SROs weren't following their own rules, and we also don't know what to do, what the SEC would do about the elephant in the room, which is the subject firm. Now Mr. Bedell didn't mention in his presentation at all the fact that the reason that we're here is because for a period of seven years, the subject firm, which is the plaintiff's designation of that entity, mismarked all of its orders as customer orders, and that the exchanges did not know that those orders were mismarked. And so under the PFOF rules, as they were required to do, when those orders came in as customer orders, the SROs charged the payment for order flow fees. So questions here are not just what would the SEC do with respect to the accusation that the SROs violated their own rules, because under the rules as they're written, they didn't. The question is what would the SEC say about the subject firm, and both of those are questions that the SEC has never been asked to address. The other thing that I would like to address in the first instance briefly is Mr. Bedell's statement that the idea that perfecting markets and fostering competitions amongst exchanges is not a regulatory function, and that's wrong. In fact, it is such a significant regulatory function that it's specifically set forth as one of the goals of Section 6 of the 34 Act. Every rule that an SRO proposes and that gets approved by the SEC must in some way act to foster competition and try to perfect the national market system. And in fact, the SEC can't approve a rule if it doesn't fulfill those obligations. So those are directly part of what the SEC is charged in overseeing, and the SROs are charged with doing in terms of developing the national market system under the 34 Act. There's nothing more regulatory than that to the extent that issue matters. And Mr. Bedell was back and forth between exhaustion and immunity, and I would point out that in two cases specifically, DL Capital and NYSE specialists, the Second Circuit in both of those cases held that conduct designed to perfect the national market system is immune conduct. And the reason it held that is because it's specifically set forth as one of the goals in Section 6. Now, obviously this case is about rules governing how fees are allocated. Each of the exchanges has a PFOF rule, as your honors have seen in the briefing. Those rules exist to do a number of things that Congress has specified as goals under the 34 Act, including enhancing liquidity and competition amongst exchanges. And that was an express goal of Congress when it enacted the 75 Amendments. And what it said was that it wanted to increase competition among the exchanges. So that is what Congress designed the system to do. It's uncontested that as required by the 34 Act, every rule that's at issue in this case was submitted to the SEC, and they were either expressly approved or allowed to go into effect without interference by the SEC. It's also uncontested that the SEC has devoted substantial resources to studying PFOF programs, including asking for public comment on whether it should ban them entirely. Now, there was some discussion of the document that's in the record starting at page 57, which is called And I think it's very important for the court to look at that document because it shows the SEC spending an extraordinary amount of time and asking an extraordinary number of questions about these systems. The SEC specifically noted that competition for order flow amongst exchanges had resulted in transaction fees for customers getting narrower. In other words, it's good for customers. And what the SEC actually said there was that PFOF programs primarily benefit intermediaries in the first instance, and that may be passed on to customers. One of the other things that I'd like to point out about that competitive developments release is something it says inside the release that didn't get a lot of attention in the briefs, but I think the court should focus on. We know that the plaintiffs didn't seek the SEC's views on the issues that they're talking about now, but we know that some of the plaintiffs really do know how to go and ask the SEC to do things, because if you look in the competitive developments release, there is a discussion of a petition filed by Susquehanna. And what that petition requested was that Susquehanna, which is one of the plaintiffs here, be excluded from all payment for order flow programs. And the reason that I bring this up is that what it shows is that these plaintiffs know how to ask the SEC for relief. They know how to ask the SEC to do things relevant to these programs. They just didn't do it with respect to these claims. What's the date of the release? 2004. 2004. Well, should we make anything of the fact that a decade has passed and the SEC hasn't chosen to move in the area? No, Your Honor. I think what you, well, what you can make of it is that the SEC hasn't felt the need to move, because remember that under the 34 Act, and the SEC has the authority to abrogate, amend, or modify the rules of any SRO anytime it sees fit, when it sees fit. And if it doesn't see fit to do that, then it won't act. And it has not acted here. That is not for lack of there having been requests for it to act, including specifically the ones that I mentioned from Susquehanna. One of the things that you will see if you look at that concept release, is the SEC asking lots and lots of very, very detailed questions about what it ought to do. It studied, though, it got whatever responses it got to those questions, and determined not to act. That is, that is, you know, an endorsement of the programs by negative action in these circumstances. Is it possible that the SEC will reject this if it's passed on to them? I'm sorry, could you repeat that question, Judge Mannion? Sure. Is it possible that the SEC would reject jurisdiction over this for some reason? Again, that's one of those we don't know questions. The only way to find out is to ask, and in fact, that's why we point out in our briefs that the way you demonstrate futility is to either try it and fail, or point to some, you know, missing, you know, some authority that shows that it's not available. You know, Mr. Bedell focused on Rule 420 of the SEC Rules of Practice. I think that's a red herring, because Rule 420 is only a rule of practice. It doesn't define the SEC's jurisdiction. What defines the SEC's jurisdiction is the 34 Act, and I would specifically direct you to Section 19 of the 34 Act, and actually both Section 6 and Section 19. Section 6 describes what rules can be approved and what rules have to satisfy in order to be approved, and the implication from that is if a rule doesn't satisfy those requirements, the SEC can't approve it, or if the SEC finds that it needs to make a modification to make a rule consistent with Section 6, it has to do that under its authority under Section 19, and Section 19 gives the SEC the duty to make sure that we don't know whether there is a process for doing this, because it hasn't come up before. That probably reflects plaintiffs, in this instance, preference for trying to do things through the federal courts, because frankly, that's what lawyers are used to. That doesn't mean that the SEC has no authority. As Your Honor was pointing out earlier, it has a broad range of authorities that it can do, ranging from modifying the rules, asking for disgorgement, all the way to what you might call the death penalty sanction of revoking an exchange charter in the first registration if it finds that it's doing enough bad things and not applying its rules. So what the plaintiffs need to do, and didn't try to do, and certainly haven't done, is show that there's no adequate remedy for them before the SEC, and if the SEC were to reject jurisdiction, that itself would be appealable to a circuit court. If the SEC wrote something, an opinion or a letter, for example, in the Swirsky case, it was a letter, that would be an appealable order that could be taken up to a circuit court and they would actually have their choice of circuits under Section 25, for them to say, no, you do have jurisdiction, you should have done something different here. And that was going to be one of the things I was going to say next. So it is uncontested that the SEC could eliminate these rules entirely if it wanted to. It's also uncontested that it was the subject firm's responsibility to mark its orders correctly in the first instance. And that during this period of time, the exchanges didn't know that they were mismarked. So it's uncontested, therefore, that the exchange's PFOF rules required these fees to be charged on customer orders. To put it differently, based on the orders, what they looked like when they came in, the exchanges actually would have been violating their own rules had they not charged the fees that are at issue here. And it is, as Mr. Bedell said, uncontested that we don't have these fees anymore they've been passed on as the rules require. And so we're here for some strange reasons. The plaintiffs decided to sue the exchanges. They didn't sue the subject firm in any forum. We don't know why. Mr. Bedell hasn't said anything about that in the complaint, in the briefs before the district court, in the briefs before this court, or in his argument. They didn't ask the SEC to take action against anyone or review the exchange's performance of their duties in any way. And by the way, that's something that one has to assume the SEC would take quite seriously. In fact, the plaintiffs didn't use the 34-Act review process at all, even though, as I mentioned several minutes ago, at least Susquehanna knew how to bring things to the attention of the SEC about these rules when it wanted to. And we're here because the exchanges twice removed complaints to the district court, and the district court denied remand. Now, let me address exhaustion, because there's some back and forth and some confusion as between exhaustion and immunity. And the key issue for exhaustion is whether there's an opportunity for administrative review. That's the question. The question isn't, are the rules regulatory under some definition of that word? It's not anything else. It's, is there a path to review? And we know that there is, because we know that this is a subject that the SEC is intensely interested in. Standard, for example, the first Second Circuit opinion in Standard, there were three, unfortunately, but the first one is an example of a situation where it was what you might call a non-standard, no pun intended, type of scenario where the issue was amendment of the exchanges of an SRO's bylaws. And the plaintiffs in that case claimed the SEC couldn't address that, there was no basis, there was no path for appeal, and the court said nonetheless, yeah, you were required to exhaust and dismissed for that reason. Penmont is also an example of a situation where there was potentially not a clear path, but the Third Circuit said no, you need to exhaust and that's exactly what we have here. That system calls for the SEC to be the primary arbiter of whether SRO's have complied with their own rules and that's not been done here. And that system leaves no place for the trial courts here. Now I want to get into preemption and immunity which are really separate issues although they all function together to fulfill what Congress intended through the 1975 amendments. Immunity, preemption, and exhaustion they reinforce each other probably is the best way to think about it. They arise from different sources and they are different and they sometimes have different outcomes but with respect to claims against SRO's as the DC Circuit explained in series 7 they do often produce the same outcomes. Now with respect to preemption although the plaintiffs tried to dress up their claims as state law claims what they're really trying to do here is enforce their view of how the exchanges PFOF rules should have worked. There really is no question despite the modifications that they made to take out the allegations in the complaint that they were trying to enforce rules, those were just strikeouts from the initial complaint that's really the goal here. The goal is to enforce those rules and instead they changed it from enforcing the rules to enforcing the PFOF programs and asking for a declaration that these particular transactions were outside the PFOF programs. And that attempt fails for two different reasons. The first reason it fails is because there is no private right of action under state law or federal law as Spicer held for violation or alleged violations of SRO rules. And second the 34 Act itself preempts any kinds of cause of action under state law because it provides the exclusive basis for review here. And if plaintiffs don't like those remedies, the ones that Congress created, then that means that their beef is with Congress and that's exactly what the DC Circuit held in series 7. And then we get to immunity and for the same reason, for similar reasons, the exchanges are immune. And the test here is whether what the exchanges are doing is under the aegis of the 34 Act. If it concerns the implementation, operation or interpretation of their rules. Every court to address that issue has held that the exchanges are immune when there is a challenge under these circumstances. Whether you're looking at the NYSE specialist case, DL Capital, the Desiderio, the D'Alessio cases, they've all held that there is immunity when what you're doing is interpreting an SRO rule. And that's exactly what you have here. I could go on, but I'm getting relatively close to the end of my time, so unless the court has further questions, I think I'll rest on our papers. Did you raise preemption below? We did raise preemption below and as we noted in our brief, it was responded to specifically by the plaintiffs in their briefs in the district courts as preemption. We argued for preemption, they argued against preemption. It happens that the district court didn't address it because it didn't feel that it needed to. But we most certainly did raise preemption and we cited Series 7, for example. You spoke about being precluded, didn't you? We did say precluded in some of the briefs down below but it's effectively the same thing. Whether one says that the 34 Act precludes a cause of action or preempts it, it's effectively the same thing. It bars the plaintiffs from asserting that cause of action in the guise of a state law claim because there is this specified route for review through the SEC. Thank you, Your Honor. So, Your Honor, look at how far we've come now. Every lawyer in this room knows that administrative review of an SRO's action involves a process that is set forth by an agency that gives the plaintiff a role and gives them certain protections. Where the exchanges are now is trying to convince this court that somehow the administrative review involves a letter writing campaign or a petition where we beg the SEC to look at this, hope maybe they do and at the end of the day the SEC simply can never award damages. This court in 1999 in the Perez case addressing the same issue said, and I quote, if the administrative process cannot provide compensation, then there is no administrative remedy to exhaust. The point that you were making in that case was that even if there is a process, and there SEC is not authorized by the Exchange Act to award damages. The Second Circuit noted in the Barbara case that they have no power to do that. In a year and a half the Exchange has not been able to find a single case showing you that the SEC has ever done it or has the power to do it. So if we go to the SEC, first of all the SEC has no power to compensate my clients and under Perez that means we have no remedy to exhaust. But I also draw the court's attention to the fact that what the exchanges are now arguing is they implicitly concede that the rules of administrative review at the SEC don't allow review of this action. But they are now suggesting to you that we should go to the SEC and hope that they amend their rules. And perhaps after a two year rule making process maybe then they will have a process for us to follow. That is not the test or standard upon which administrative review and failure to exhaust should be reviewed. I would also note, Your Honor, that there can't really be any legitimate question here as to whether the SEC will in fact reject this matter. Because under Morton v. Ruiz, the United States Supreme Court said that when individual rights are involved, the administrative agency must follow their procedures. The SEC simply isn't allowed to make it up as it goes along at its own discretion. In addition um when the exchanges argue that we never went to the SEC suggesting to this court that we should have gone to the SEC I would just point out to you that the exchanges already took action. The exchanges are suggesting that somehow it is up to us to somehow pursue and make things right with the subject firm. But the exchanges already filed enforcement proceedings, each one of them against the subject firm. In that particular respect, the exchanges were actually acting in their regulatory capacity. They did what they thought was right. It didn't include ultimately any redress to us. But they took their action. There's no reason for us to go to the SEC because the SEC's stand-in in that regard, the exchanges, already took action. That actually was within their regulatory capacity. May I ask a question right there, please? Why are the other plaintiffs because that is sort of my question on the subject firm what impact is whatever the subject firm did wrong, does that have any impact on the other plaintiffs? Were they, as being self-regulatory, would have done something about it, regardless of what the other side is doing? Well, Your Honor, because of the fact that our information whatsoever about what the subject firm did or did not do, other than what was set forth in the enforcement decisions by the exchanges. In fact, that is what triggered this whole process. In the enforcement actions, the exchanges made findings that the subject firm had improperly marked their orders which meant that necessarily that the exchanges were charging us for orders that were not actually part of the program and not eligible for the program. So, we don't know what the subject firm did or didn't do. Our view, Judge Mannion, is simply that the exchanges promised to do one thing, to charge us only for eligible orders. They did another in under standard contract state law. We are therefore entitled to relief. On preemption, let me just make a couple points there. Preemption, if you search their briefs, you will find no mention of the word preemption. It's not in their briefs at all. It was not made at the lower court level. But even if it were, I refer this court to two decisions. The Second Circuit decision in Barbara versus New York Stock Exchange where, contrary to what counsel told you, the Second Circuit was reviewing state law claims in which the plaintiffs were alleging a violation of the New York Stock Exchange rules. Those rules were actually intrinsically regulatory. They had to do with actions taken against the plaintiff. The Barbara court said that even though these are state law claims premised on violations of the exchange rules, because there was no implied private right of action for the violation of those rules, and because these were made under state law, there was not a federal question presented. And we provided you with many cases that come to the same conclusion. In this court's decision in Wygod, you made the point, that case involved the Homeowners Loan Act and the Exchange Act. And you made the point that where the statute doesn't allow for a private right of action and doesn't authorize the agency to award compensation to a customer in a claim against the lending entity, that spoke clearly that it was not Congress's intent to occupy the whole field of legislation. That is exactly analogous to this case where the Exchange Act does not authorize the SEC to award damages. The SEC has no rule that would allow them to review this, and there is no implied private right of action. This case is squarely within this court's decision in Wygod. Finally, on immunity, what the exchanges failed to point out is, that in the cases the NYSE specialist case, the Weissman-Anbach decision in the 11th Circuit, and Sparta Surgical, the threshold question isn't how they came out. It is, what test did they use? And I hasten to point out here, that in Weissman, Facebook, and Opulent, the courts were each confronted with programs or activities that the courts found were designed to attract order flow to the exchange. And all of those courts using almost exactly the same language was, that when the exchange attempts to attract order flow and revenues to itself, it acts in no one's interest but its own. It is not standing in the shoes of the SEC. The SEC would never prefer one exchange over another. It would never attempt to lure order flow from one exchange to another at the expense of the other exchange. I'm out of time so unless you have questions Judge Manning, do you have any? No. Thank you, Mr. Riddell. Thanks to all counsel.